10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K

**(Mark One)**

x    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2009 or

TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from      to

### COMMISSION FILE NUMBER: 000-26489

# ENCORE CAPITAL GROUP, INC.

###### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **48-1090909** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **8875 Aero Drive, Suite 200 San Diego, California** | **92123** |
| (Address of principal executive offices) | (Zip code) |

**(877) 445-4581**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.01 Par Value Per Share | The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ¨ No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ¨ No x

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x No ¨

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ¨ No ¨

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. x

**Exhibit 7 Pg. 1**

4/26/2015 11:18 P

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer  "                                                                            Smaller reporting

Accelerated filer   x          Non-accelerated filer   "          company  "

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes  "   No  x

The aggregate market value of the voting stock held by non-affiliates of the registrant totaling 11,166,717 shares was $147,959,000 at June 30, 2009, based on the closing price of the common stock of $13.25 per share on such date, as reported by the NASDAQ Global Select Market.

The number of shares of our Common Stock outstanding at January 29, 2010, was 23,359,087.

### Documents Incorporated by Reference

Portions of the registrant's proxy statement in connection with its annual meeting of shareholder to be held in 2010 are incorporated by reference in Items 10, 11, 12, 13, and 14 of Part III of this Form 10-K.

# Exhibit 7 Pg. 2

4/26/2015 11:18 I

**Table of Contents**

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **PART I** | 1 |
| Item 1—Business | 1 |
| Item 1A—Risk Factors | 6 |
| Item 1B—Unresolved Staff Comments | 17 |
| Item 2—Properties | 17 |
| Item 3—Legal Proceedings | 17 |
| Item 4—Submission of Matters to a Vote of Security Holders | 19 |
|  | 20 |
| **PART II** |  |
| Item 5—Market for the Registrant's Common Equity Securities, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6—Selected Financial Data | 22 |
| Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 7A—Quantitative and Qualitative Disclosure about Market Risk | 57 |
| Item 8—Financial Statements and Supplementary Data | 57 |
| Item 9—Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 57 |
| Item 9A—Controls and Procedures | 57 |
| Item 9B—Other Information | 60 |
|  | 60 |
| **PART III** | 60 |
| Item 10—Directors, Executive Officers and Corporate Governance | 60 |
| Item 11—Executive Compensation | 60 |
| Item 12—Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 60 |
| Item 13—Certain Relationships and Related Transactions, and Director Independence | 60 |
| Item 14—Principal Accountant Fees and Services | 60 |
|  | 61 |
| **PART IV** | 61 |
| Item 15—Exhibits and Financial Statement Schedules | 66 |
| SIGNATURES |  |

**Exhibit 7 Pg. 3**

4/26/2015 11:18

# PART I

## Item 1—Business

### An Overview of Our Business

*Nature of Business*

We are a systems-driven purchaser and manager of charged-off consumer receivable portfolios and, through our wholly owned subsidiary Ascension Capital Group, Inc., or Ascension, a provider of bankruptcy services to the finance industry. We acquire receivable portfolios at deep discounts from their face values using our proprietary valuation process that is based upon an analysis of the individual consumer attributes of the underlying accounts. Based upon our ongoing analysis of these accounts, we employ a dynamic mix of collection strategies to maximize our return on investment. The receivable portfolios we purchase consist primarily of unsecured, charged-off domestic consumer credit card, auto loan deficiency and telecom receivables purchased from national financial institutions, major retail credit corporations, telecom companies and resellers of such portfolios. From September 2005 through June 2007, we also purchased healthcare receivables from hospitals and resellers of healthcare receivables. In September 2007, we exited our healthcare purchasing and internal collection activities, although we are still receiving collections from certain healthcare portfolios that we own. Acquisitions of receivable portfolios are financed from operating cash flows and borrowings from third parties. See Note 8 to our consolidated financial statements for further discussion of our debt.

We have been in the collection business for 56 years and started purchasing portfolios for our own account approximately 19 years ago. From our inception through December 31, 2009, we have invested approximately $1.4 billion to acquire 28.8 million consumer accounts with a face value of approximately $43.8 billion.

We have established certain relationships with credit card issuers, other lenders and resellers that allow us to purchase portfolios directly through negotiated transactions. We also participate in auction-style purchase processes that typify our industry and enter into "forward flow" arrangements in which we agree to buy receivables that meet agreed upon parameters over the course of the contract term.

We evaluate each portfolio for purchase using the proprietary valuation and underwriting processes developed by our in-house team of statisticians. Unlike many of our competitors, which we believe primarily base their purchase decisions on numerous aggregated portfolio-level factors, including the originator, the type of receivables to be purchased, or the number of collection agencies the accounts have been placed with previously, we base our purchase decisions primarily on our analysis of the specific accounts included in a portfolio. Based upon this analysis, we determine a value for each account, which we aggregate to produce a valuation of the entire portfolio. We believe this capability allows us to perform more accurate valuations of receivable portfolios. We have successfully applied this methodology to receivables across multiple asset classes.

After we purchase a portfolio, we continuously refine our analysis of the accounts to determine the best strategy for collection. As with our purchase decisions, our collection strategies are based on account level criteria. Our collection strategies include:

- the use of a nationwide network of collection attorneys to pursue legal action where appropriate;

- outbound calling, driven by proprietary, predictive software, by our own collection workforce located at our three domestic call centers and our international call center in India;

- the use of multiple third party collection agencies;

- direct mail campaigns coordinated by our in-house marketing group;

- the transfer of accounts to a credit card provider, generating a payment to us; and

- the sale of accounts where appropriate.

1

**Exhibit 7 Pg. 4**
4/26/2015 11:18